# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Case No. 25-cv-03971-PAB-NRN

BENJAMIN RODGERS,
ASAAD ABRAH RAHAMA,
and those similarly situated,

     Plaintiffs,

v.

UNITED STATES OF AMERICA,

     Defendant.

---

## **FIRST AMENDED COLLECTIVE ACTION COMPLAINT**

---

### **INTRODUCTION**

1. Plaintiffs Benjamin Rodgers and Asaad Abrah Rahama bring this action under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 et seq., because the United States required them and thousands of other TSA officers to keep us safe during the 2025 federal government shutdown and 2026 Department of Homeland Security shutdown and paid them nothing on their regularly scheduled paydays during the shutdowns.

2. Under federal minimum wage law, employers that fail to timely pay minimum wages on regular paydays not only owe unpaid minimum wages but also "liquidated damages" equal to the total unpaid minimum wages. One key purpose of "liquidated damages" is to compensate workers for the harm of working without timely lawful pay—the bills that go unpaid, the anxiety of not knowing whether you are going to be able to pay rent or put food on the table.

1

3.      In many cases involving government employees who work without pay during a shutdown, courts have determined that the federal agency employer escapes this liability because it is legally constrained from paying its employees.

4.      But in the 2025 federal shutdown and 2026 Department of Homeland Security ("DHS") shutdown, DHS was not legally constrained. Instead, DHS made a choice: It decided to pay some of its employees and not others. Specifically, it decided to pay officers working for Immigration and Customs Enforcement ("ICE"), among others, while refusing to pay TSA agents screening passengers at our ports.

5.      This required work without pay caused some TSA employees to quit, others to resort to food banks to feed themselves and their families, and still others to forgo needed medical treatments until they were finally paid.

6.      In March 2026, while the DHS shutdown was still ongoing, the President directed DHS and the Office of Management and Budget to use existing appropriated funds with a "reasonable and logical nexus to TSA operations" to pay TSA employees during the shutdown. Public reporting further stated that the Administration was tapping funds from the One Big Beautiful Bill Act, Pub. L. No. 119-21 (2025) ("OBBBA"), which had been enacted before either shutdown. That decision to pay TSA employees during the shutdown using already-existing appropriations confirms that Defendant was not legally incapable of paying TSA employees during either shutdown but instead chose not to do so.

7.      ICE officers implementing President Trump's immigration enforcement agenda did not have to forgo paying bills because they were working without pay. They did not have to fear that

2

they would not be able to make rent or put food on the table. But the TSA agents protecting our ports did have to live with those fears. That is what this case is about.

8.      Because DHS made a choice to not pay TSA agents during the shutdowns, Plaintiffs and the class they seek to represent are entitled to liquidated damages.

## JURISDICTION AND VENUE

9.      This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1346(a)(2), because each claim of each individual Plaintiff seeks monetary damages not exceeding $10,000 and is founded on federal statute — the FLSA.

10.     This Court also has jurisdiction pursuant to 28 U.S.C. § 1331.

11.     Venue is proper in this District under 28 U.S.C. § 1391, because Plaintiffs worked at Denver International Airport ("DIA") in Colorado and a substantial part of the events occurred in this District.

## PARTIES

12.     Plaintiff Benjamin Rodgers is a resident of Colorado. During all relevant times, he worked full-time as a Transportation Security Officer at DIA.

13.     Plaintiff Asaad Abrah Rahama is a resident of Colorado. During all relevant times, he worked full-time as a Transportation Security Officer at DIA.

14.     Plaintiffs signed the Fair Labor Standards Act Consent forms attached as Exhibit A.

15.     Defendant is the United States of America, the employer of TSA personnel for purposes of the FLSA.

## COLLECTIVE ACTION ALLEGATIONS

16.     Plaintiffs bring this action as a collective action under 29 U.S.C. § 216(b), on behalf of:

3

ALL TSA EMPLOYEES WHO PERFORMED WORK DURING THE 2025 FEDERAL GOVERNMENT SHUTDOWN OR THE 2026 DHS SHUTDOWN AND RECEIVED $0 IN WAGES ON ANY REGULAR PAYDAY FOR WORK PERFORMED DURING THE SHUTDOWNS.

17. Plaintiffs and the collective members are "similarly situated" within the meaning of 29 U.S.C. § 216(b) because:

a. They were all employed by the TSA;

b. They were all required to work during one or both of the shutdowns;

c. They all received $0 on paydays during the shutdown periods; and

d. They all were paid only after the shutdown ended.

18. The legal question is common: Does paying $0 on a regular payday to an employee who worked full time violate the FLSA minimum wage requirement and entitle the employee to liquidated damages?

19. Plaintiffs consent to participate in this action and attach written consents to sue pursuant to § 216(b) as Exhibit A.

## FACTUAL ALLEGATIONS

20. Plaintiffs regularly worked approximately 40 hours per week.

21. During the shutdowns, Plaintiffs and other TSA employees were designated as "essential," required to report to duty, and barred from refusing work.

22. Plaintiffs and other TSA officers performed full-time duties during multiple pay periods in which they received $0 on regularly scheduled paydays.

23. Plaintiffs are paid biweekly.

4

24.     Plaintiff Rodgers worked during the 2025 federal government shutdown, during which the government claimed a lack of appropriations to pay TSA officers from approximately October through mid-November 2025.

25.     Plaintiff Rodgers received a partial paycheck on October 10, 2025.

26.     Despite working the entire 2025 shutdown period, Plaintiff Rodgers was not paid again until November 19, 2025.

27.     Both Plaintiffs worked during the 2026 DHS shutdown, during which the federal government claimed a lack of appropriations to pay TSA officers from approximately February 2026 through the present.

28.     Both Plaintiffs received a partial paycheck on or about February 27, 2026.

29.     Despite working the entire 2026 DHS shutdown period, Plaintiffs were not paid again until March 30, 2026, when no new appropriations were made, but the federal government used existing appropriations to pay TSA officers.

30.     The FLSA requires the minimum wage to be paid on the regular payday for the pay period.

31.     The violations occurred on each payday where the government issued no wage payment to Plaintiffs and the collective members, which includes Plaintiff Rodgers' biweekly paydays between October 10, 2025 and November 19, 2025 where Plaintiff Rodgers was working his normal 40-hour-a-week schedule and receiving no pay on his regular paydays and Plaintiffs' biweekly paydays between on or about February 27, 2026 and March 30, 2026.

32.     Defendant knowingly required TSA personnel to work without pay while contemporaneously finding funding mechanisms to pay ICE personnel and other DHS components.

33.     Defendant's nonpayment was not compelled by law but was a funding-allocation decision.

34.     During the shutdowns, the White House directed the Department of Homeland Security to continue timely payment to certain DHS employees, notwithstanding the lapse in annual appropriations.

35.     In response, DHS allocated available funding to ensure full and timely salary payments to selected DHS components throughout the shutdown period.

36.     Those shutdown payments included compensation covering the same pay periods in which TSA officers received $0 on their regularly scheduled paydays, demonstrating that DHS continued payroll operations for certain employees during the shutdown.

37.     DHS publicly identified approximately 70,000 other employees—including some personnel within the Transportation Security Administration—as being paid in full for all hours worked during the shutdown, while TSA screening officers received no pay on their regular paydays.

38.     DHS justified these shutdown-period payments based on policy preference for certain enforcement functions and not on any legal requirement barring timely payment to TSA screening officers, thereby confirming that DHS possessed discretion to issue timely pay and chose not to exercise that discretion for TSA officers.

39.     On March 27, 2026, while the DHS shutdown was ongoing, the President issued a memorandum to the Secretary of Homeland Security and the Director of the Office of Management and Budget regarding compensation for TSA employees. *See* Memorandum from President Donald J. Trump to the Secretary of Homeland Security and the Director of the Office of Management and Budget, *Paying Our Great Transportation Security Administration Officers and Employees* (Mar. 27, 2026), *available at* https://www.whitehouse.gov/presidential-actions/2026/03/memorandum-for-the-secretary-of-homeland-security-and-the-director-of-the-office-of-management-and-budget/.

40.     In that memorandum, the President directed DHS and OMB to use funds that had a "reasonable and logical nexus to TSA operations" to provide TSA employees with the compensation and benefits that would have accrued to them absent the shutdown.

41.     The memorandum did not identify any newly enacted appropriation for TSA pay.

42.     Instead, the memorandum directed DHS and OMB to use already-available appropriated funds within DHS, consistent with applicable law, including 31 U.S.C. § 1301(a).

43.     Public reporting stated that, "[t]he administration is planning to use funding from last summer's [OBBBA] to pay TSA officers."

44.     OBBBA was enacted as Public Law 119-21 on July 4, 2025, before the October 2025 federal shutdown and before the February 2026 DHS shutdown.

45.     OBBBA included Section 90007, which appropriated $10,000,000,000 to the Secretary of Homeland Security for fiscal year 2025, to remain available until September 30, 2029, for reimbursement of costs incurred in support of DHS's mission to safeguard the borders of the United States.

46.     The Administration is using Section 90007 to pay TSA officers, including Plaintiffs.

47.     Thus, by March 27, 2026, DHS and OMB had identified an already-existing source of appropriated funds that could be used to provide compensation to TSA employees during the shutdown.

48.     In the alternative, as of March 30, 2026, Defendant is relying on other funds for TSA agent payments that were appropriated and existed for payment prior to either shutdown.

49.     On or about March 30, 2026, TSA employees began receiving pay during the shutdown pursuant to that decision.

50.     The Executive Branch itself determined that existing appropriations lawfully could be used to pay TSA employees during the shutdown, directed DHS and OMB to do so, and then paid TSA employees without waiting for any new appropriation to be enacted.

51.     That determination and payment show that Defendant was not legally incapable of paying TSA employees, including Plaintiffs, during either shutdown.

52.     Instead, Defendant chose not to pay TSA employees, including Plaintiffs, on their regularly scheduled paydays during those shutdowns.

53.     On or about April 2, 2026, while the DHS shutdown was still ongoing, the President publicly stated that he would "soon sign an order to pay ALL of the incredible employees at the Department of Homeland Security."

54.     On April 3, 2026, while the DHS shutdown was still ongoing, the President issued a memorandum directing the Secretary of Homeland Security, in coordination with the Director of the Office of Management and Budget, to use funds that had a "reasonable and logical nexus to the functions of DHS" to provide "each and every employee of DHS" with the compensation and

8

benefits they would have received absent the shutdown. *See* Memorandum from President Donald J. Trump to the Secretary of Homeland Security and the Director of the Office of Management and Budget, *Liberating the Department of Homeland Security From the Democrat-Caused Shutdown* (Apr. 3, 2026), available at https://www.whitehouse.gov/presidential-actions/2026/04/liberating-the-department-of-homeland-security-from-the-democrat-caused-shutdown/.

55.     That April 3, 2026 directive did not identify any newly enacted appropriation for DHS payroll. Instead, it directed DHS and OMB to use already-existing appropriated funds within DHS, consistent with applicable law, including 31 U.S.C. § 1301(a).

56.     Public reporting regarding the April 3rd directive stated, "[t]he White House said in a memo it can pay DHS employees using funds from a large budget and tax bill approved by Congress last summer." This means that the Administration was relying on funds from the OBBBA, which was appropriated prior to either shutdown, to support those payments.

57.     That reporting further confirms that, by early April 2026, the Executive Branch had identified already-existing appropriations that it believed could lawfully be used to pay DHS employees during the shutdown.

58.     Those events confirm that Defendant was not legally incapable of paying TSA employees during the shutdown, but instead chose not to pay them on their regularly scheduled paydays until later.

59.     Defendant knew or should have known that this constituted a violation of the FLSA and acted without good-faith justification.

9

60.     Plaintiffs and the similarly situated TSA employees were engaged in commerce and in the production of goods for commerce, as defined by the FLSA, 29 U.S.C. § 203(b), because their job duties were integral to the interstate aviation system used to move passengers, baggage, cargo, and commercial goods across state and national boundaries.

61.     Plaintiffs' job duties included the screening, inspection, handling, examination, and processing of passenger property, checked baggage, carry-on bags, cargo, identification documents, boarding passes, equipment, and materials that had moved in interstate and/or foreign commerce, or were intended to move in interstate and/or foreign commerce.

62.     Plaintiffs routinely interacted with and processed passengers who were traveling to or from destinations outside the State of Colorado, including both interstate and international locations.

63.     Denver International Airport is a major interstate transportation hub and an instrumentality of interstate commerce. Plaintiffs' and the collective members' work at DIA was conducted at a facility used for interstate and foreign transportation of persons and goods.

64.     The movement of persons and property by air constitutes interstate commerce, and Plaintiffs' work facilitating that movement — including ensuring security and clearance necessary for air travel — constitutes engagement in interstate commerce within the meaning of the FLSA.

65.     Alternatively, Defendant constitutes an enterprise engaged in commerce within the meaning of 29 U.S.C. § 203(s), because TSA is a unified governmental operational entity conducting activities that materially affect interstate commerce through the management, control, and regulation of commercial air travel.

10

66.     Plaintiffs' duties materially affected the movement of persons and property in interstate commerce because the screening functions performed by TSA officers are required for airlines to lawfully and safely transport passengers and cargo across state and national borders.

## CLAIM FOR RELIEF

### (Violation of FLSA — Failure to Timely Pay Minimum Wages, 29 U.S.C. § 206)

67.     Plaintiffs incorporate all preceding paragraphs.

68.     Defendant employed Plaintiffs and all similarly situated TSA workers under the FLSA.

69.     Defendant failed to pay Plaintiffs and collective members any wages on multiple regular paydays during the shutdown.

70.     This resulted in a minimum wage violation for each paycheck.

71.     Defendant's conduct was willful and/or in reckless disregard of clearly established FLSA requirements.

72.     Under 29 U.S.C. § 216(b), Plaintiffs and collective members are entitled to recover an additional and equal amount as liquidated damages.

73.     Plaintiffs and collective members seek liquidated damages equal to the minimum wages due for each missed payday.

74.     No individual Plaintiff's claim, inclusive of all jurisdictionally relevant amounts including attorney's fees, exceeds $10,000.

75.     Plaintiffs also seek attorney's fees and costs as permitted by the FLSA and by law governing Little Tucker Act claims.

## JURY DEMAND

76.     Plaintiffs demand a jury trial on all causes of action so triable.

## **PRAYER FOR RELIEF**

77.     WHEREFORE, Plaintiffs, individually and for all others similarly situated, respectfully

requests that this Court:

A. Certify this case as a collective action under 29 U.S.C. § 216(b);

B. Authorize notice to similarly situated TSA employees;

C. Award liquidated damages equal to unpaid minimum wages on every $0 payday

during the shutdown;

D. Award attorney's fees and costs;

E. Award any applicable interest; and

F. Grant all further relief the Court deems just and proper.

Respectfully submitted,

*s/David H. Seligman*

*s/Alexander Hood*
David H. Seligman
Alexander Hood
Victoria E. Guzman
Towards Justice
PO Box 371680, PMB 44465
Denver, CO 80237-5680
720-239-2606
David@towardsjustice.org
alex@towardsjustice.org
victoria@towardsjustice.org

Attorneys for the Plaintiffs

12

## CERTIFICATE OF SERVICE

I hereby certify that on April 6, 2026, a true and correct copy of the foregoing was electronically filed with the Clerk of the Court using the CM/ECF electronic filing system, which will send notification to all counsel of record.

*s/Alexander Hood*
Alexander Hood

# EXHIBIT A

Docusign Envelope ID: 4FF8C773-E670-4C30-8F67-18FD6890B11B

## CONSENT TO JOIN

1.      I hereby consent, agree, and opt-in to become a Plaintiff in *Rodgers v. United States of America,* filed in the United States District Court for the District of Colorado and brought under the Fair Labor Standards Act to recover liquidated damages and any other legal redress for my time working for the United States of America in the Transportation Security Administration. I understand that there may be other persons or entities discovered in the litigation that are also liable for my claim and I authorize my claim to be brought against those other persons or entities too.

2.      I agree to be bound by any adjudication of this action by the Court, whether it is favorable or unfavorable.

3.      I hereby designate Towards Justice (the "Attorney") to represent me in this action.

**DATE:** 12/10/2025

**SIGNATURE:** Ben Rodgers

**PRINTED LEGAL NAME: Benjamin Rodgers**

## CONSENT TO JOIN

1.      I hereby consent, agree, and opt-in to become a Plaintiff in *Rodgers v. United States of America,* filed in the United States District Court for the District of Colorado and brought under the Fair Labor Standards Act to recover liquidated damages and any other legal redress for my time working for the United States of America in the Transportation Security Administration. I understand that there may be other persons or entities discovered in the litigation that are also liable for my claim and I authorize my claim to be brought against those other persons or entities too.

2.      I agree to be bound by any adjudication of this action by the Court, whether it is favorable or unfavorable.

**3.**      I hereby designate Towards Justice (the "Attorney") to represent me in this action.

**DATE:** 04/03/2026

**SIGNATURE:**

**PRINTED LEGAL NAME:** Asaad Abrah Rahama